IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| **KENLY B. NIFONG,** | ) | |
| **Plaintiff,** | ) | |
| | ) | Case No. 1:16-cv-63 |
| v. | ) | |
| | ) | |
| **SOC, LLC,** | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION[1]

In this retaliation action, plaintiff alleges that defendant, a federal contractor and plaintiff's former employer, took adverse actions against plaintiff, including the termination of plaintiff's employment, in retaliation for plaintiff's reporting of defendant's practice of designating employees at pay grades higher than warranted for the duties performed in order to bill the government at a higher rate. Specifically, plaintiff alleges two claims against defendant: (i) a False Claims Act ("FCA") retaliation claim pursuant to 31 U.S.C. § 3730(h), and (ii) a National Defense Authorization Act ("NDAA") reprisal claim pursuant to 41 U.S.C. § 4712. Defendant has moved to dismiss both claims for failure to state a claim. As the matter has been fully briefed and argued orally, it is now ripe for disposition.

---

[1] This Memorandum Opinion amends the Memorandum Opinion dated June 2, 2016. *Nifong v. SOC, LLC*, No. 1:16-cv-63 (E.D. Va. June 2, 2016) (Memorandum Opinion) (Doc. 24). As defendant correctly notes in its memorandum in support of defendant's motion for reconsideration, the June 2, 2016 Memorandum Opinion erroneously recited a fact not alleged in plaintiff's complaint. Although that error is immaterial to the result reached here—and therefore defendant's motion for reconsideration must be denied—this amended Memorandum Opinion nonetheless corrects the error identified by defendant.

1

I.[2]

Plaintiff Kenly B. Nifong, a resident of Florida, is a former employee of defendant SOC, LLC, a government contractor that provides services at U.S. Department of State ("DOS") facilities around the world, including Baghdad, Iraq.

In September 2012, plaintiff began working for defendant, and in March 2013, defendant sent plaintiff to Iraq to work on the Worldwide Protective Services contract, SAQMMA10F521 ("WPS Contract"),[3] with DOS, as a Deputy Project Manager of Operations for the Baghdad Embassy Security Force Project. Thereafter, on June 29, 2013, plaintiff became aware that defendant's employee, James McKaughan, a Private Security Specialist ("PSS") on the WPS Contract, had recently been assigned to a Shift Leader ("SL") position, a higher ranking position than PSS. McKaughan's new SL designation allowed defendant to bill the government at a higher rate for McKaughan's work, even though McKaughan continued to perform the duties of a PSS, not the duties of an SL.

Soon after plaintiff became aware of McKaughan's new SL designation, plaintiff contacted Detail Leader ("DL") James Martin to discuss the matter. Thereafter, on June 30, 2013, DL Martin informed plaintiff by email that defendant had deliberately designated McKaughan as an SL because "keeping personnel in the highest paying/billable positions regardless of the actual job being performed was [the] general practice at the Baghdad Embassy Compound, and had been since [defendant] obtained the contract." Compl. ¶ 81. In response,

---

[2] The facts stated here are derived from the complaint and "documents incorporated into the complaint by reference," as is appropriate on a motion to dismiss. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

[3] Plaintiff's complaint does not identify the WPS Contract by name, but plaintiff's supplemental pleading dated June 1, 2016, does so. Because the contract is incorporated by reference in the complaint, the identification of the contract by plaintiff's supplemental pleading is appropriately used here. *See Tellabs*, 551 U.S. at 322.

2

plaintiff told DL Martin that this practice appeared to be contract fraud and that defendant should correct the practice.

That same day, plaintiff reported the McKaughan designation to his supervisor, Project Manager ("PM") Bancroft McKittrick. Plaintiff also reported to McKittrick defendant's more general practice of designating personnel at the highest possible positions in order to bill the DOS at the highest possible rate. As plaintiff had previously stated to DL Martin, plaintiff also noted to PM McKittrick that this practice appeared to constitute fraud and suggested that defendant should self-report the practice to the DOS. In response, PM McKittrick told plaintiff not to report the practice and assured plaintiff that PM McKittrick would correct the practice before the next billing cycle. Plaintiff then sent PM McKittrick a follow-up email in which plaintiff (i) reiterated his concerns about the billing practice, (ii) noted that he believed the practice "could easily be construed as fraud," and (iii) identified specific corrections to be made before the next billing cycle. Def. Ex. C., McKittrick Email (June 30, 2013). Shortly thereafter, PM McKittrick replied to this email, copying Deputy PM of Facilities and Support Kismet Rollins and Deputy PM of Operations Rich Tudor. *Id.* In this reply, PM McKittrick thanked plaintiff for taking action and directed Deputy PM Rollins to determine what further steps were needed. *Id.*

Later that day, June 30, 2013, Deputy PM Rollins emailed plaintiff, PM McKittrick, and Deputy PM Tudor recommending that "if it doesn't affect the mission," defendant should continue to "fill the high paying positions and down post the low paying positions so the employee will make more money" and defendant "will make more profit." Compl. ¶ 92, Def. Ex. D, Rollins Email (June 30, 2013). In other words, Deputy PM Rollins recommended that defendant should continue designating employees at pay grades higher than necessary for the

3

duties performed in order to bill the government at a higher rate. Plaintiff responded to Deputy PM Rollins, PM McKittrick, and Deputy PM Tudor, stating that "I still cannot see how we can bill for a SL if the person if [sic] a PSS position" and that "there is an ethical question to be answered." *Id.* ¶ 93, Def. Ex. D, Plaintiff Email (June 30, 2013). Plaintiff later asked Administrative Logistics Support Services Manager ("ALSSM") Josh Noble if anything had been done to correct defendant's billing practice; ALSSM Noble indicated he was unaware of any efforts to correct the billing practice.

Thereafter, on July 2, 2013, plaintiff reported the McKaughan designation to DOS Contracting Officer Representative Anthony Hill, the DOS employee who monitored and directed defendant's performance of the WPS Contract. Plaintiff asked Hill to protect his identity and to keep the information confidential, and Hill agreed. Nonetheless, Hill told others at the DOS about plaintiff's report. Shortly thereafter, plaintiff informed Assistant Regional Security Officer Chris Vega, a DOS employee, that plaintiff had reported the McKaughan designation to Hill.

Almost three months later, on September 25, 2013, Deputy PM Rollins issued plaintiff a new rotation schedule that plaintiff alleges was adverse to plaintiff. Plaintiff also alleges that Deputy PM Rollins required plaintiff to accept the new rotation schedule immediately, which plaintiff declined to do. Thereafter, on September 29, 2013, PM McKittrick called plaintiff (i) noting that plaintiff did not support defendant's management, and (ii) accusing plaintiff of misconduct. Shortly thereafter, on October 8, 2013, during a weekly conference call, Deputy PM Rollins said that plaintiff was "having trouble" and that "we need to get him out right away."

Compl. ¶ 116-17.[4] Two days after the conference call, PM McKittrick emailed a "Counseling Statement" to plaintiff, characterizing the email as a follow up to the "verbal warning" PM McKittrick had given plaintiff during the September 29, 2013 telephone call. Def. Ex. F, Counseling Statement. The Counseling Statement described plaintiff's poor work performance and unprofessional conduct.

Thereafter, on December 6, 2013, while in the United States on unpaid leave, plaintiff submitted a complaint by email to defendant's parent company, Day & Zimmerman, stating that plaintiff had reported "wrong-doing," and as a result, was suffering retaliation, slander, defamation, and harassment. Def. Ex. H, Pl. Email (Dec. 6, 2013). Plaintiff's email further advised defendant's parent company that although plaintiff's visa did not expire until December 23, 2013, plaintiff would not return to Iraq before that date because he had "lost trust and confidence in most of [defendant's] corporate staff" and could not "in good faith go back to a company that allows [the alleged] behavior to continue," but would instead "simply remain on the bench until [he found] other employment or these issues [were] resolved." *Id.*[5]

Ten days later, on December 16, 2013, Claude Goddard, a lawyer retained by Day & Zimmerman, contacted plaintiff. Goddard explained that he had been retained to investigate plaintiff's complaint and promised to provide plaintiff with the results of the investigation sometime after Christmas 2013.

On December 28, 2013, plaintiff received a letter from defendant notifying plaintiff that his employment with defendant had been terminated, effective December 23, 2013, for violating

---

[4] The complaint alleges that plaintiff was present during the conference call, but that Deputy PM Rollins was apparently unaware—or had forgotten—that plaintiff was on the call when Deputy PM Rollins made the statement about plaintiff.

[5] The "bench" refers to a list of defendant's inactive personnel available to fill vacancies. Compl. ¶¶ 54-55.

International Trafficking in Arms Regulations ("ITAR") during his previous deployment in Iraq. Specifically, the termination letter stated that plaintiff had given some of defendant's ammunition to Iraqi Special Forces, in violation of ITAR, in exchange for the use of an Iraqi shooting range. Def. Ex. A, DOS Inspector General Report.[6]

On October 13, 2014, plaintiff submitted a complaint to the DOS Inspector General ("IG"), alleging that plaintiff's employment had been terminated in retaliation for plaintiff's whistleblowing activity. The DOS IG investigated plaintiff's complaint and ultimately concluded that defendant had shown by clear and convincing evidence that defendant had not terminated plaintiff's employment in retaliation for any protected activity, but had instead done so on the basis of plaintiff's poor performance and improper conduct.

On February 8, 2016, plaintiff filed a complaint alleging that defendant terminated plaintiff's employment with defendant in retaliation for plaintiff's reporting of defendant's allegedly fraudulent employee designation practice. Specifically, plaintiff alleges two claims against defendant: (i) an FCA retaliation claim pursuant to 31 U.S.C. § 3730(h), and (ii) a NDAA reprisal claim pursuant to 41 U.S.C. § 4712.

Thereafter, defendant filed a motion to dismiss both of plaintiff's claims for failure to state a claim on which relief can be granted pursuant to Rule 12(b)(6), Fed. R. Civ. P. Plaintiff then filed a motion for leave to amend the complaint in order to allege additional facts with respect to the § 4712 claim. Specifically, plaintiff sought to add a factual allegation that the DOS IG deemed § 4712 applicable to the WPS Contract. Importantly, this additional factual allegation would make no difference in determining whether § 4712 applies to the WPS Contract, but because there may be additional facts material to plaintiff's § 4712 claim, plaintiff's motion for

---

[6] Plaintiff concedes that he engaged in this activity, but claims he was authorized to do so.

leave to amend was granted by Order dated May 27, 2016. *Nifong v. SOC, LLC*, No. 1:16-cv-63 (E.D. Va. May 27, 2016) (Order) (Doc. 21). In this regard, during oral argument on plaintiff's motion for leave to amend and defendant's motion to dismiss, defendant agreed to allow plaintiff to review the WPS Contract and modifications to that contract in order to determine whether § 4712 is applicable here. Accordingly, by Order dated May 27, 2016, (i) defendant's motion to dismiss was taken under advisement pending plaintiff's review of the WPS Contract documents, and (ii) plaintiff was directed to submit a pleading by June 1, 2016, addressing whether § 4712 governs the WPS Contract. *Id.*

On June 1, 2016, plaintiff filed a supplemental pleading stating that defendant had provided plaintiff with the WPS Contract documents, and that upon review of those documents, plaintiff concluded that § 4712 governs the WPS Contract, and therefore provides a basis for a reprisal claim here. Thus, defendant's motion to dismiss is ripe for disposition.

## II.

Dismissal pursuant to Rule 12(b)(6), Fed. R. Civ. P., is appropriate where the complaint does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* Instead, the complaint must allege facts that plausibly satisfy each element of the claims for which relief is sought. *Id.* at 679. Accordingly, a motion to dismiss must be granted if the complaint does not allege a factual basis to support a plausible inference that plaintiff is entitled to relief.

## III.

Defendant first contends that plaintiff's NDAA reprisal claim pursuant to 41 U.S.C. § 4712 must be dismissed because that statute, a temporary statute that applies only to a four-year period, does not apply here.

Under § 4712, an employee of a federal contractor may bring a reprisal claim against the federal contractor. Yet, as defendant correctly notes, § 4712 is a "pilot program" that temporarily suspends application of 41 U.S.C. § 4705, a similar provision that does not provide a private cause of action. *Id.* § 4705(f). Specifically, § 4712 is effective only for a four-year period beginning on July 1, 2013, 180 days after the date of enactment. *See* 41 U.S.C. § 4712(i). In this respect, Congress provided that "[t]he amendments made [to § 4712] shall take effect on the date that is 180 days after the date of the enactment of this Act [July 1, 2013], and shall apply to":

    (A) all contracts and grants awarded on or after such date;

    (B) all task orders entered on or after such date pursuant to contracts awarded before, on, or after such date; and

    (C) all contracts awarded before such date that are modified to include a contract clause providing for the applicability of such amendments.

National Defense Authorization Act for Fiscal Year 2013, Pub. L. 112-239, Div. A. Title VIII, sec. 828(b)(1), 126 Stat. 1837, 1840 (2013) (codified at 41 U.S.C. § 4712). Thus, § 4712 governs only conduct arising from contracts entered or modified within the four-year period to include a clause expressly incorporating § 4712, whereas § 4705 governs conduct arising from contracts outside the four-year period. Importantly, an individual has a private right of action for an NDAA reprisal claim only if § 4712—rather than § 4705—is the governing statute.

Here, as defendant correctly contends, plaintiff's § 4712 reprisal claim must be dismissed because § 4712 does not apply to the WPS Contract. This is so because plaintiff's complaint

alleges that defendant sent plaintiff to Iraq to work on the WPS Contract in March 2013, more than three months before the effective date of § 4712, and plaintiff's complaint fails to allege any facts that support a conclusion that the WPS Contract was modified after July 1, 2013, to include a contract clause expressly providing that § 4712 applied.

Moreover, in plaintiff's supplemental pleading, plaintiff concedes (i) that the WPS Contract pre-dated the July 1, 2013 effective date for § 4712, and (ii) that although the WPS Contract was modified approximately 40 times after July 1, 2013, none of these modifications expressly provides for the applicability of § 4712. Nonetheless, plaintiff contends that § 4712 governs the WPS Contract simply because that contract was modified after July 1, 2013. Yet, this argument fails because as already noted, only a modification that expressly incorporates § 4712 sweeps a contract pre-dating July 1, 2013 within the purview of § 4712.

Thus, the WPS Contract is not governed by § 4712, but is instead governed by § 4705, which does not provide a private cause of action. Accordingly, plaintiff's NDAA reprisal claim must be dismissed.

### IV.

Defendant next contends that plaintiff's FCA retaliation claim pursuant to 31 U.S.C. § 3730(h) should be dismissed for failure to state a claim pursuant to Rule 12(b)(6). Yet, in this respect, defendant's motion must be denied because plaintiff's complaint alleges facts that plausibly support an FCA retaliation claim.

Under § 3730(h), an employee may bring a retaliation claim against an employer who retaliates against the employee for the employee's "lawful acts ... in furtherance of [a qui tam] action under this section or other efforts to stop 1 or more violations of [the FCA]." 31 U.S.C. § 3730(h). To plead a § 3730(h) retaliation claim, a plaintiff must allege facts that plausibly

9

support the conclusion (i) that the plaintiff engaged in a protected activity, (ii) that the employer knew about the plaintiff's protected activity, and (iii) that the employer took adverse action against plaintiff as a result of the protected activity. *Glynn v. EDO Corp.*, 710 F.3d 209, 214 (4th Cir. 2013). Importantly, a plaintiff need not prove an underlying FCA violation because, as the Supreme Court has explained, § 3730(h) protects an employee's conduct "even if the target of an investigation or action to be filed was innocent." *Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 545 U.S. 409, 416 (2005). Moreover, the Fourth Circuit has made clear that a plaintiff's allegations need only meet the pleading standard set forth in Rule 8(a), Fed. R. Civ. P., not the heightened pleading standard set forth in Rule 9(b), Fed. R. Civ. P. *Smith v. Clark/Smoot/Russell*, 796 F.3d 424, 433 (4th Cir. 2015).[7] And in this regard, the Fourth Circuit has further explained that at the motion to dismiss stage, a plaintiff's burden is significantly lower than it is on a motion for summary judgment, as a reviewing court is "obligated to view only the [plaintiff's] pleadings, and to view them generously in the [plaintiff's] favor." *Young v. CHS Middle East, LLC*, 611 F. App'x 130, 133 (4th Cir. 2015).

Defendant contends that plaintiff's complaint fails to state an FCA retaliation claim because plaintiff (i) fails to allege facts that plausibly support a conclusion that plaintiff engaged in a protected activity, (ii) fails to allege facts that plausibly support a conclusion that defendant was on notice that plaintiff engaged in a protected activity, and (iii) fails to allege facts that plausibly support a conclusion that defendant took an adverse action against plaintiff as a result of plaintiff's protected activity. Each of these arguments is addressed separately.

---

[7] It is worth noting that fraud claims under the FCA, unlike FCA retaliation claims, are subject to the heightened pleading standard set forth in Rule 9(b), Fed. R. Civ. P. *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783-84 (4th Cir. 1999).

With respect to defendant's first argument—that plaintiff's complaint fails to allege facts that plausibly support a conclusion that plaintiff engaged in a protected activity—the Fourth Circuit has long applied the "distinct possibility" standard to determine whether a plaintiff engaged in a protected activity. *Mann v. Heckler & Koch Def., Inc.*, 630 F.3d 338, 344 (4th Cir. 2010). Under that standard, "protected activity occurs when an employee's [actions] take place in a context where 'litigation is a distinct possibility, when the conduct could reasonably lead to a viable FCA action, or when ... litigation is a reasonable possibility.' " *Id.* (quoting *Eberhardt v. Integrated Design & Constr., Inc.*, 167 F.3d 861, 869 (4th Cir. 1999)). Put another way, under the distinct possibility standard, an employee's actions must "relate to company conduct that involves an objectively reasonable possibility of an FCA action ... from the perspective of the facts known by the employee at the time of the protected conduct." *Id.* at 344, 345.

Plaintiff contends that the distinct possibility standard does not apply here because a 2009 amendment to § 3730(h) expanding the definition of protected activity compels application of a lower standard. As plaintiff correctly notes, before the 2009 amendment, "protected activity," as defined in § 3730(h), included only acts done "in furtherance of an FCA claim." *Young*, 611 F. App'x at 133. Now, as a result of the 2009 amendment, protected activity includes both (i) acts done "in furtherance of an FCA claim" and (ii) "other efforts to stop one or more violations" of the FCA. *Id.* Although the Fourth Circuit has not yet defined the contours of "other efforts to stop" FCA violations, it has recognized that the amended statute "plainly encompasses" more activities than before, and accordingly, "even assuming ... that [a plaintiff] provide[s] no factual basis for alleging that the defendant[] [was] aware that [the plaintiff] was pursuing a claim of a fraudulent false claim, ... that would not necessarily mean that he has pled no plausible factual underpinning for a retaliation claim." *Smith*, 796 F.3d at 433-34 (internal quotation marks and

11

citation omitted). Although the Fourth Circuit has not squarely addressed whether the distinct possibility standard still applies in light of the 2009 amendment, numerous district courts, post-amendment, have applied the distinct possibility standard in determining whether a plaintiff has engaged in a protected activity.[8] Importantly, it need not be determined here whether the 2009 amendment compels a standard lower than the distinct possibility standard because even under the distinct possibility standard, plaintiff has alleged facts that plausibly support a conclusion that plaintiff engaged in protected activity.[9]

Specifically, contrary to defendant's contention, plaintiff has alleged facts that plausibly support a conclusion that plaintiff took actions that "relate to company conduct that involves an objectively reasonable possibility of an FCA action" from plaintiff's perspective at the time of the conduct[10] insofar as plaintiff's complaint alleges the following facts:

> (i) that on or about June 29, 2013, plaintiff raised his concern with DL Martin regarding the designation of McKaughan as an SL;

> (ii) that after DL Martin informed plaintiff that defendant had deliberately designated McKaughan as an SL in accordance with defendant's general practice of designating employees at the highest possible billable rate, plaintiff told DL Martin that this practice appeared to constitute contract fraud and suggested that defendant correct the practice;

> (iii) that on June 30, 2013, plaintiff reported to his supervisor, PM McKittrick, the McKaughan designation and the general practice of designating personnel at the highest billable positions, noting that plaintiff believed this to be a fraudulent practice and suggesting that defendant should self-report the practice to the DOS;

---

[8] *See, e.g., Dunn v. Millirons*, Civ. A. No. 7:14-cv-00429, 2016 WL 129909, at *6 (W.D. Va. Mar. 31, 2016) (citing *Mann*, 630 F.3d at 344); *United States ex rel. Garzione v. PAE Gov't Servs., Inc.*, No. 1:15cv833, 2016 WL 775780, at *8 (E.D. Va. Feb. 25, 2016) (citing *Mann*, 630 F.3d at 344).

[9] Of course, it may become necessary to address this issue at the summary judgment stage.

[10] *Mann*, 630 F.3d at 344.

12

(iv) that after PM McKittrick instructed plaintiff not to report the billing practice and assured plaintiff that the practice would be corrected before the next billing cycle, plaintiff sent PM McKittrick a follow-up email in which plaintiff reiterated his concerns regarding the billing practice, specifically noted that the practice "could easily be construed as fraud," and identified specific corrections to be made before the next billing cycle, McKittrick Email (June 30, 2013);

(v) that shortly thereafter, when Deputy PM Rollins recommended that defendant should continue the practice in order to maximize profits, plaintiff again raised his concern that the billing practice was wrong; and

(vi) that on July 2, 2013, when it appeared defendant would not change the billing practice, plaintiff reported the McKaughan designation to DOS Contracting Officer Representative Hill.

These allegations plausibly support the conclusion that plaintiff engaged in protected activity because the alleged actions "relate[d] to company conduct that involve[d] an objectively reasonable possibility of an FCA action" from the facts known by plaintiff at the time of the activity. *Mann*, 630 F.3d at 344. Put another way, a reasonable employee in plaintiff's position could reasonably conclude that defendant's billing practice amounted to fraud against the government in violation of the FCA. It may well be that defendant's billing practice did not, in fact, violate the FCA, but as already noted, a plaintiff need not establish an underlying FCA violation because § 3730(h) protects an employee's conduct "even if the target of an investigation or action to be filed was innocent." *Graham Cnty. Soil & Water Conservation Dist.*, 545 U.S. at 416. Here, there can be no doubt that plaintiff took several steps to report what reasonably appeared to be a fraudulent billing practice to plaintiff's supervisors and to the DOS. Accordingly, contrary to defendant's contention, plaintiff's complaint alleges facts that plausibly support the conclusion that plaintiff engaged in a protected activity pursuant to § 3730(h).[11]

---

[11] In opposition to the conclusion reached here, defendant points to *U.S. ex rel. Davis v. Prince*, No. 1:08CV1244, 2010 WL 2679761, at *4 (E.D. Va. July 2, 2010), in which an FCA retaliation claim was dismissed because "[t]he full extent of factual allegations" was a "threadbare recital of the elements of an FCA retaliation claim" alleging only that plaintiff had been terminated in

13

Defendant next contends that plaintiff's complaint fails to allege facts that plausibly support a conclusion that defendant was on notice of plaintiff's protected activity. As the Fourth Circuit has explained, the notice element is viewed from the employer's perspective, and "turns on whether the employer ... is 'on notice that litigation is a reasonable possibility.' " *United States ex rel. Parks v. Alpharma, Inc.*, 493 F. App'x 380, 388 (4th Cir. 2012) (quoting *Eberhardt*, 167 F.3d at 868). In this regard, "notice can be accomplished by expressly stating an intention to bring a *qui tam* suit, but it may also be accomplished by any action which a factfinder reasonably could conclude would put the employer on notice that litigation is a reasonable possibility," such as, *inter alia*, "characterizing the employer's conduct as illegal or fraudulent or recommending that legal counsel become involved." *Eberhardt*, 167 F.3d at 868.

Here, contrary to defendant's contention, plaintiff's complaint alleges facts that plausibly support the conclusion that defendant was on notice that litigation was a reasonable possibility. Specifically, as already noted, plaintiff made several reports to his supervisors "characteriz[ing]" defendant's billing practice as fraudulent and suggesting that it should be corrected. Contrary to defendant's contention, these allegations plausibly support the conclusion that defendant was on notice of plaintiff's protected activity.

Finally, defendant contends that plaintiff's FCA retaliation claim must be dismissed because plaintiff's complaint fails to allege facts that plausibly support a conclusion that defendant took an adverse action against plaintiff as a result of plaintiff's protected activity. In support of this contention, defendant makes two arguments: (i) that the nearly three-month

---

retaliation for plaintiff's questioning of supervisors and expressing her concern about billing practices. *Id.* Contrary to defendant's contention, *Davis* is inapposite where, as here, a plaintiff alleges detailed facts that plausibly support an FCA retaliation claim. Indeed, unlike in *Davis*, plaintiff characterized the billing practice in issue here as fraud and reported the practice not only to several supervisors, but also to the DOS.

14

period between plaintiff's protected activity and defendant's adverse action against plaintiff is insufficient to establish a causal nexus, and (ii) that inasmuch as there is a causal nexus, several intervening acts related to plaintiff's job performance severed that causal nexus.

Both arguments fail because they are premised on the flawed assumption that the *McDonnell Douglas*[12] burden-shifting framework applicable in Title VII cases applies here. To be sure, many courts analyze § 3730(h) retaliation claims under the *McDonnell Douglas* burden-shifting framework on summary judgment,[13] but it is inappropriate to apply that framework here on a motion to dismiss. In this regard, the Supreme Court has made clear (in the context of Title VII) that to survive a motion to dismiss, a complaint need not "contain specific facts establishing a prima facie case for discrimination under the framework set forth in ... *McDonnell Douglas*." *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 508 (2002). Thus, defendant's first argument—that the temporal proximity of nearly three months between plaintiff's protected activity and defendant's adverse action is insufficient to establish a causal nexus—fails, as the only cases defendant cites for this proposition were decided at the summary judgment stage.[14] Similarly, defendant's second argument—that intervening actions related to plaintiff's job performance

---

[12] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

[13] *See, e.g., Liburd v. Bronx Lebanon Hosp. Ctr.*, 372 F. App'x 137, 139 (2d Cir. 2010); *Dillon v. SAIC, Inc.*, No. 1-12-CV-390, 2013 WL 324062, at *9 (E.D. Va. Jan. 28, 2013); *Glynn v. Impact Science & Tech. Inc.*, 807 F. Supp.2d at 416 (D. Md. 2001).

[14] *See, e.g., Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (holding on summary judgment that a three-month period was insufficient by itself to establish a causal nexus); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-75 (7th Cir. 1992) (holding on summary judgment that a four-month period was insufficient by itself to establish a causal nexus).

severed the causal nexus—fails because that argument is premature at the motion to dismiss stage, where the burden-shifting framework does not apply.[15]

Here, on a motion to dismiss, plaintiff's complaint meets the much lower burden of alleging facts that plausibly support a conclusion that defendant took adverse actions against plaintiff as a result of plaintiff's protected activity. Specifically, the complaint alleges:

> (i) that on September 25, 2013, approximately three months after plaintiff's protected activity, Deputy PM Rollins issued a new rotation schedule that was adverse to plaintiff;
>
> (ii) that on September 29, 2013, after plaintiff did not immediately accept the new rotation schedule, PM McKittrick told plaintiff via telephone that plaintiff did not support defendant's management and accused plaintiff of misconduct;
>
> (iii) that on October 8, 2013, during a weekly conference call, Deputy PM Rollins said that plaintiff was "having trouble" and that "we need to get him out right away," Compl. ¶ 116-17;
>
> (iv) that approximately two days after the October 8, 2013 conference call, PM McKittrick emailed a "counseling statement" to plaintiff, characterizing the email as a follow up to the "verbal warning" PM McKittrick had given plaintiff during the September 29, 2013 telephone call;
>
> (v) that on December 6, 2013, plaintiff submitted a formal complaint to defendant's parent company, Day & Zimmerman, alleging that plaintiff had reported "wrong-doing," and as a result, defendant was retaliating against plaintiff; and
>
> (vi) that on December 28, 2013, plaintiff received a letter from defendant notifying plaintiff that he was discharged from his employment with defendant, effective December 23, 2013, for violating ITAR during his previous Iraq deployment.

These alleged facts plausibly support a conclusion that defendant took adverse actions against plaintiff—namely, implementing a rotation schedule adverse to plaintiff and terminating

---

[15] In support of the proposition that intervening poor performance severs the causal nexus between a protected activity and an adverse action, defendant cites only out-of-circuit cases resolved on summary judgment. *See, e.g., Seaman v. CSPH, Inc.*, 179 F.3d 297, 301 (5th Cir. 1999); *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999); *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 828 (1st Cir. 1991). These cases are neither binding nor persuasive here.

plaintiff's employment with defendant—as a result of the protected activity in which plaintiff had engaged nearly three months before the first alleged adverse action. Defendant's arguments to the contrary may be persuasive on a motion for summary judgment, but they fall well short where, as here, on a motion to dismiss, plaintiff has not yet had discovery to garner more evidence to support a causal nexus between the alleged adverse actions and the protected activity. As already noted, the Fourth Circuit has made clear that at the motion to dismiss stage, a plaintiff's burden is significantly lower than it is on a motion for summary judgment, as a reviewing court is "obligated to view only the [plaintiff's] pleadings, and to view them generously in the [plaintiff's] favor." *Young*, 611 F. App'x at 133. Under this standard, plaintiff's complaint alleges facts sufficient to survive a motion to dismiss.

In sum, plaintiff's complaint alleges facts that plausibly support a conclusion that defendant's alleged adverse actions, including the termination of plaintiff's employment, were the result of plaintiff's protected activity, and therefore defendant's motion to dismiss must be denied with respect to plaintiff's FCA retaliation claim.

### V.

Accordingly, for the reasons stated here, defendant's motion to dismiss must be granted in part and denied in part. Specifically, defendant's motion must be granted with respect to plaintiff's NDAA reprisal claim, and accordingly that claim must be dismissed. The motion must be denied with respect to plaintiff's FCA retaliation claim.

An appropriate Order has issued.

Alexandria, Virginia
June 6, 2016

T. S. Ellis, III
United States District Judge