**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **KENLY B. NIFONG,** | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 1:16-cv-63** |
| **v.** | ) | |
| | ) | |
| **SOC, LLC,** | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

At issue on summary judgment in this False Claims Act ("FCA")[1] retaliation case is whether the undisputed factual record entitles the defendant to judgment as a matter of law. Plaintiff, Kenly Nifong, contends that defendant, SOC, LLC ("SOC")—a federal contractor and Nifong's former employer—discharged Nifong because he reported to his supervisor and the Department of State that SOC may have overcharged the government with respect to the billing rate of an SOC employee.[2] As the matter has been fully briefed and argued orally, it is now ripe for disposition. For the reasons that follow, SOC's summary judgment motion must be granted.

---

[1] Specifically, the FCA provides a cause of action to

> [a]ny employee … discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee … in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h)(1). Of course, a plaintiff need not prove an underlying FCA violation to prevail on a retaliation claim. *See Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 545 U.S. 409 (2005).

[2] The complaint also alleged a second retaliation claim under the National Defense Authorization Act, 41 U.S.C. § 4712, which claim was dismissed pursuant to Rule 12(b)(6), Fed. R. Civ. P. *See Nifong v. SOC, LLC*, 190 F. Supp. 3d 549 (E.D. Va. 2016).

# I.

## A.

To begin with, it is necessary to address whether the parties complied with the requirements for presenting a summary judgment motion elucidated in Local Civil Rule 56(B) and the Rule 16(b) Scheduling Order issued in this matter. Pursuant to Local Rule 56(B) and the Rule 16(b) Scheduling Order, a motion for summary judgment must contain a separately captioned section listing, in numbered-paragraph form, all material facts that the movant contends are not genuinely disputed. *See* Rule 56, Local Civ. R.; *Nifong v. SOC, LLC*, No. 1:16-cv-63 (E.D. Va. July 7, 2016) (the "July 7 Order"). Although SOC fully complied with both the Local Rule and the July 7 Order, Nifong did not; Nifong only partially complied.

Specifically, although Nifong noted that he does not contest 29 of SOC's 62 undisputed material facts, he did not clearly and specifically respond to the remaining 33 facts asserted by SOC. For example, Nifong simultaneously admitted and disputed one of SOC's facts. *Compare* P. Br. (Doc. 57) at 1 (admitting paragraph 30) *with id.* at 16 (disputing paragraph 30 without citation or explanation). Nifong also neglected to address some of SOC's factual paragraphs altogether: Nifong does not address defendant's paragraphs 24, 52, 58 or 60. Moreover, Nifong submitted his own narrative statement of undisputed facts comprising eleven pages. This alternative, narrative statement of facts not only fails to comply with the July 7 Order, but also serves to undermine Local Rule 56(B) by frustrating the ability to determine which material facts are genuinely in dispute. *See Integrated Direct Marketing, LLC v. May*, 129 F. Supp. 3d 336, 345 (E.D. Va. 2015) (a party's "narrative version of its own interpretation of the facts fails to comply with Local Civil Rule 56(B), largely contains argument, and makes it difficult to determine exactly which material facts are disputed"). Because Nifong did not comply with Local Rule

56(B) and the July 7 Order, "[t]he Court may assume that any fact identified by the movant as undisputed … is admitted for the purpose of deciding the motion for summary judgment." *Nifong v. SOC*, No. 1:16-cv-63 (E.D. Va. July 7, 2016). Nonetheless, Nifong's narrative statement of facts and responses to SOC's statement of facts will be considered as a whole and scoured to identify any material facts that might reasonably be in dispute.

As the following list of undisputed material facts reveals, there are some facts that Nifong contends to be in dispute, but those disputes are either immaterial or unsupported. Any material fact identified in SOC's briefs—but properly disputed by Nifong—is omitted from the list below.

## B.

- In 2012, SOC hired Nifong as an at-will employee. Nifong was hired to serve as a Deputy Project Manager – Operations ("DPMO") for SOC's contract with the State Department to provide security for the U.S. Embassy in Baghdad, Iraq.

- According to Nifong's employment contract and deployment letter, SOC's "target rotation" was for Nifong to spend 105 days in Iraq, followed by 35 days of unpaid leave, during which time Nifong was deemed "on the bench" and was not entitled to any salary or other compensation.

- This target rotation, however, was tentative, and the actual deployment schedules for SOC employees often changed based on the company's business needs. For instance, the Iraqi government frequently denied or delayed the issuance of visas, which sometimes made it more difficult for SOC to replace employees in Iraq and permit deployed personnel to go on leave.

- On March 13, 2013, Nifong deployed to Iraq, and his initial assignment was as DPMO at the Baghdad Diplomatic Support Center.

- Nifong had broad supervisory authority over the Bagdad Diplomatic Support Center and was subordinate only to SOC's Project Manager in Iraq. As of June 2013, SOC's Project Manager in Iraq, and thus plaintiff's supervisor, was Bancroft McKittrick.

- SOC was also responsible for providing security for a separate facility in Iraq, the Bagdad Embassy Compound.

- On June 21, 2013, SOC promoted James McKaughn from his position as a Protective Security Specialist ("PSS") to a Shift Leader at the Baghdad Diplomatic Support Center.

- SOC bills the government a higher rate for a Shift Leader than for a PSS.

- Nifong questioned McKaughn's promotion from a PSS to Shift Leader because there were insufficient personnel to staff a team for McKaughn to lead.

- On June 30, 2013, Nifong notified his supervisor, McKittrick, of McKaughn's promotion from PSS to Shift Leader.

- At the time Nifong sent the June 30 notification to McKittrick, Nifong knew that SOC had not yet billed the government for McKaughn's services at the higher Shift Leader rate.

- In response to Nifong's June 30 notification, McKittrick commended and thanked Nifong for raising the issue.

- That same day, June 30, 2013, McKittrick also directed Kismet Rollins, the Deputy Program Manager of Facilities and Support and one of Nifong's peers, to determine what needed to be done to ensure proper accounting for McKaughn's assignment. McKittrick also instructed Nifong to coordinate with Rollins and SOC corporate personnel to ensure that the correct information was provided to SOC's employee responsible for reporting personnel assignments to the State Department.

- Ms. Rollins responded by email to McKittrick's directions, opining that SOC should fill high paying positions so that SOC would make more profit.

- Nifong responded by proposing that McKaughn be reassigned to a PSS.

- McKittrick replied, agreeing with Nifong's recommendation that McKaughn be reassigned to a PSS.

- Later that same day, June 30, 2013, Nifong provided Kismet Rollins documentation correcting McKaughn's assignment.

- In response, Rollins asked Nifong for a status change form that would restore McKaughn to a PSS position. As a result, on July 1, 2013, the status change form was executed, and McKaughn was restored to his lower-billing position as a PSS.

- The State Department had a Government Technical Monitor onsite in Iraq to review these precise kinds of assignment and billing issues.

- In fact, McKittrick notified the Government Technical Monitor of the Shift Leader assignment issue. The Government Technical Monitor considered SOC's steps to be the appropriate corrective action, and did not discuss McKaughn's assignment further.

- On July 2, 2013—before checking whether or how SOC had billed for McKaughn's services as a Shift Leader—Nifong sent an email from his personal email account to a State Department Regional Security Officer, Anthony Hill.

4

- In that email to Mr. Hill, Nifong reported McKaughn's nine-day assignment to a Shift Leader position. Nifong also advised that SOC was unaware of Nifong's report to the State Department. *Id.*

- Shortly thereafter, Nifong also shared vague details about his July 2 email with Chris Vega, one of the State Department's Assistant Regional Security Officers.

- Neither McKittrick nor Rollins knew that Nifong had made this report to the State Department until after Nifong's termination.[3]

- Nifong subsequently spoke with Joshua Noble, SOC's logistics and administrative manager, and asked whether SOC had done anything to change the bills or invoices for McKaughn's services. Mr. Noble stated that he did not know whether any bill or invoice had been changed. Nifong did not pursue this issue further.

- Nifong, despite claiming that Mr. Noble's response alarmed him, did not address any concern regarding overbilling with his supervisor or SOC's management personnel until December 6, 2013, at which time Nifong informed SOC that he had been subjected to retaliation, that he would not redeploy to Iraq, and that he was instead seeking other employment.

- In fact, after McKaughn returned to a PSS position, neither Nifong nor his subordinates found any instance where one of SOC's employees was improperly assigned to a position at the Baghdad Diplomatic Support Center.

- Ultimately, SOC billed the government for McKaughn's services for June 21–July 1, 2013 at the higher Shift Leader rate, for a total overcharge of $573.90. SOC did not recognize this billing error until 2014, and subsequently gave the State Department a credit for that same amount, $573.90.

- Notwithstanding Nifong's June 30, 2013 communication with McKittrick and the July 2, 2013 communication with the State Department, Nifong twice elected to extend his deployment in Iraq beyond the "target" of 105 days.

---

[3] Nifong purports to dispute this fact, pointing to Nifong's own deposition testimony that a separate State Department employee had told Nifong that there was "widespread knowledge" of Nifong's email and disclosure to Anthony Hill. *See* P. Br. (Doc. 57) at 14. Needless to say, Nifong's testimony relays inadmissible hearsay—if not double hearsay—without any applicable exception or exclusion to the hearsay bar. *See* Rules 801-803 & 805, Fed. R. Evid. Thus, Nifong has failed to cite competent evidence to create a genuine factual dispute on this point.

- To compensate Nifong for extending his deployment, SOC, in August 2013 and September 2013, paid him a combined $18,000 in bonuses.

- In 2013, SOC had a written policy requiring employees to be familiar with International Traffic in Arms Regulations ("ITAR") before becoming involved in any transaction that contemplates the transfer of defense articles or services.[4]

- In this vein, on August 13, 2013, Nifong received compliance training on SOC's Export and Import Control manual.

- According to SOC's policy, employees must consult with the SOC Empowered Official for ITAR matters—Linda Rudisill—or the SOC Compliance Committee before transferring defense articles. Employees must comply with this policy so that SOC's Empowered Official or Compliance Committee may determine whether a license is required.[5]

- From August to October 2013 Nifong, despite ITAR and SOC's policies, transferred thousands of rounds of U.S.-manufactured ammunition to U.S. Special Forces personnel so that the ammunition could be given to Iraqi Special forces. In doing so, Nifong hoped that the Iraqi Special Forces would permit SOC employees to use the Iraqi Special Forces firing range.

- During this same timeframe, Nifong ceremonially gave four or five boxes of U.S.-manufactured ammunition to an Iraqi general in the presence of U.S. Special Forces personnel. Yet, Nifong did not have the required authorization—from SOC's Empowered Official or Compliance Committee—to do so. Nifong was therefore in violation of SOC's Export Manual.[6]

---

[4] ITAR provides that U.S.-made defense articles, such as ammunition, may not be directly (or indirectly) transferred to foreign persons without a license issued by the Department of State Directorate of Defense Trade Controls ("DDTC"). *See* 22 C.F.R. § 120 *et seq.*

[5] Nifong contends that this fact is disputed, but does not cite any evidence that calls into question what SOC's policy requires. *See* P. Br. (Doc. 57) at 19-20. Thus, Nifong fails to establish a genuine dispute of material fact here.

[6] Nifong argues that this fact is in dispute, asserting that  McKittrick condoned Nifong's bartering of U-S.-manufactured ammunition. This argument fails. First, even assuming McKittrick condoned Nifong's actions, that would not rescue Nifong's conduct from being a violation of SOC policy or ITAR. Second, McKittrick denies having condoned Nifong's actions, and the only evidence to the contrary is plaintiff's own testimony, which is unsupported by any other record evidence. In these circumstances, Nifong's unadorned assertion does not create a genuine issue of material fact; no reasonable juror could conclude that plaintiff complied with SOC policy.

- On September 25, 2013, Nifong and two of his peer Deputy Project Managers—Odis Goodnight and Tandy Carter—received notice of their respective leave and rotation schedules.

- Nifong's schedule stated that he would go on leave starting October 29, 2013, and return 70 days later as the DPMO for the Baghdad Embassy Compound. The contemplated 70 days' leave doubled the "target" of 35 days' leave.

- Nifong's peers, Odis Goodnight and Tandy Carter, also received schedules that, like Nifong's schedule, exceeded the "target" leave period of 35 days.

- By late September 2013 Nifong had been in Iraq for approximately seven months, and several other DPMOs employed by SOC had been on leave, awaiting the opportunity to be redeployed to Iraq.

- Before his employment ended, Nifong did not describe this September 25 notice as retaliatory in any of his reports to the Department of State.

- On September 29, 2013, McKittrick discussed with Nifong by telephone McKittrick's dissatisfaction with Nifong's work performance.

- This September 29 telephone call had no financial impact on Nifong, nor did it affect the terms or conditions of his employment.

- Before his employment ended, Nifong did not describe this September 29 phone call as retaliatory in any report to the Department of State.

- On October 7, 2013, Nifong sent an email to McKittrick, revealing that Nifong had used U.S.-manufactured ammunition "for trade on the Iraqi range." D. Ex. H-1.

- The next day, October 8, 2013, a telephone conference occurred among SOC's representatives and State Department personnel. Nifong, who was present for the telephone conference, heard one of his peers, Kismet Rollins, state that Nifong was "having trouble" at the Baghdad Diplomatic Support Center, that Nifong was "difficult to work with," and that SOC "need[ed] to get [Nifong] out right away." D. Ex. A (Nifong Depo.) at 215:9-218:13.

- Rollins's October 8 comments had no financial impact on Nifong and did not affect the terms of his employment.

- Before his employment ended, Nifong did not describe this October 8 telephone conversation as retaliatory in any report to the Department of State.

- On October 9, 2013, McKittrick wrote an email to two of SOC's senior officers, forwarding a written warning that McKittrick intended to give to Nifong. In that October 9 email, McKittrick recommended that Nifong's employment be terminated.

- On October 10, 2013, McKittrick issued Nifong the written warning, identifying multiple incidents of work performance issues and unprofessional conduct. The report also noted Nifong's "poor attitude," insubordination, and failure to follow proper safety procedures. P. Ex. 13.

- The October 10 warning had no financial impact on Nifong and did not affect the terms of his employment.[7]

- The decision-makers who determined to terminate Nifong's employment neither cited nor relied on this warning as a basis for their decision.

- On October 12, 2013, SOC's Director of Compliance, Linda Rudisill, learned that Nifong had been providing ammunition to U.S. Special Forces to give to Iraqi Special Forces, likely in violation of ITAR and SOC's policy.

- Subsequently, SOC's General Counsel, J. Michael Littlejohn, tasked Ms. Rudisill and SOC's Staff Attorney, Justin Callaway, to investigate Nifong's potential violations.

- As they conducted this investigation, neither Rudisill nor Callaway had any knowledge of (i) Nifong's June 30, 2013 email regarding McKaughn's brief promotion from PSS to Shift Leader or (ii) Nifong's communications with the State Department regarding McKaughn's promotion, or (iii) any claim that Nifong was a target of retaliation.

- On October 18, 2013, Nifong notified SOC's Acting Project Manager, Michael Clasby, that Nifong's decision whether to return to Iraq after completing his unpaid leave would depend solely (i) on whether Nifong would be permitted to return to the Baghdad Diplomatic Support Center (as opposed to the Embassy Center) within 35 days, and (ii) on the identity of Nifong's supervisor.[8]

---

[7] Nifong claims to dispute this fact by citing to (i) McKittrick's deposition testimony that McKittrick believed that Nifong should have been fired, and (ii) the October 9, 2013 email in which McKittrick wrote to defendant's officers that McKittrick could not recommend that defendant continue employing Nifong. This attempt to create a genuine factual dispute fails because the undisputed record makes clear that neither the October 9 email nor the October 10 warning were relied on when SOC's decision-makers ultimately resolved to terminate Nifong's employment. In fact, after Nifong received the October 10 warning, SOC offered him the opportunity to redeploy to Iraq after approximately 35 days' leave.

[8] Nifong's efforts to dispute this fact fail; he does not dispute what he wrote, but simply asserts that he did not mean his words literally. Of course, Nifong's own gloss on his statements' *meaning* falls well short of establishing a genuine dispute over their *content*.

- Thereafter, on October 20, 2013, SOC asked Nifong to extend his paid deployment as DPMO at the Baghdad Diplomatic Support Center for another two weeks. Nifong agreed, and thus his leave would not commence until November 14, 2013.

- Three days later, on October 23, 2013, Nifong responded in writing to McKittrick's October 10 warning. Nifong disputed some incidents but acknowledged that a State Department Regional Security Officer had safety concerns regarding a firing range that was being operated under Nifong's supervision.

- On October 25, 2013, Rudisill and Callaway interviewed Nifong regarding his potential ITAR violations and failures to comply with SOC policy. During that interview, Nifong admitted that he gave ammunition to U.S. Special Forces personnel so that the ammunition could be given to Iraqi Special Forces personnel as "barter" to gain access to the Iraqis' firing range.

- Rudisill and Callaway specifically instructed Nifong that he could not transfer any SOC ammunition to Iraqi Special Forces without first obtaining a proper license. Despite this instruction, Nifong insisted that SOC continue giving ammunition to Iraqis as gifts.

- Nifong's response in the face of express instructions not to transfer ammunition without a license alarmed Rudisill and Callaway.

- On November 14, 2013, Nifong's last day in Iraq, SOC requested that Nifong return to Iraq by December 23—i.e., after approximately 35 days' leave, which was the "target" rotation.

- Nifong refused this request because Nifong first wanted to know (i) whether Nifong would be deployed to the Baghdad Diplomatic Support Center or to the Embassy Compound, and (ii) who his supervisor would be.

- That same day, November 14, Rudisill and Callaway completed their investigation into Nifong's conduct. Rudisill and Callaway concluded that Nifong, on multiple occasions, violated ITAR and SOC policies by transferring U.S-manufactured ammunition to Iraqi Special Forces, both directly and indirectly. Rudisill and Callaway forwarded their conclusions to SOC's General Counsel, Littlejohn.

- In light of Rudisill and Callaway's findings, SOC also made a voluntary disclosure of Nifong's likely ITAR violations to the State Department's Office of Defense Trade Controls Compliance.

- On November 15, 2013, Littlejohn recommended to SOC's Program Manager, Thomas Heasley, that Nifong's employment be terminated.

- That same day, Heasley decided to terminate Nifong's employment based on Nifong violations of ITAR and company policies.

- At the time Littlejohn recommended Nifong's termination, Littlejohn was unaware that Nifong had raised any issue regarding McKaughn's brief promotion to a Shift Leader. Nor did Littlejohn know of any allegations that Nifong was a victim of retaliation.

- At the time Heasley accepted Littlejohn's recommendation to terminate Nifong, Heasley was unaware that Nifong had raised any issue about inaccurate billing rates. Nor was Heasley aware of any allegations that Nifong was being retaliated against.

- SOC decided to wait until after it had voluntarily disclosed Nifong's ITAR violations to the State Department before sending Nifong a formal termination notice.

- On December 6, 2013 Nifong, while on leave, notified SOC that he would not return to Iraq. Rather, Nifong informed SOC that he would remain on leave until he found other employment or until the "issues" Nifong had with SOC were resolved. D. Ex. A at 292:4-13 & Ex. 40 at 5.

- That same day, December 6, Nifong asked SOC's Chief Executive Officer, John DiMarco, about McKaughn's brief promotion.

- Nifong, on December 6, disclosed to SOC for the first time (i) that Nifong had been subjected to allegedly unfair and unprofessional treatment by McKittrick and Rollins, and (ii) that Nifong had contacted the State Department regarding McKaughn's promotion.

- By December 10, 2013, Nifong had booked a cruise for the end of December 2013 and early January 2014.

- On December 23, 2013, SOC voluntarily disclosed to the State Department several ITAR violations arising from Nifong's conduct. Specifically, SOC reported Nifong's transfer of U.S.-manufactured ammunition to U.S. Special Forces personnel to be given to Iraqi Special Forces, as well as Nifong's providing four or five boxes of U.S.-manufactured ammunition to an Iraqi general in the presence of U.S. Special Forces.

- That same day, December 23, Heasley provided Nifong a formal termination notice.

- The December 23, 2013 termination notice stated that Nifong's employment was being terminated because Nifong had violated SOC's policies and ITAR.

- On January 13, 2014, the State Department informed SOC that Nifong's conduct constituted an ITAR violation.

- Nine months later, on October 12, 2014, Nifong reported the above-described incidents to the State Department's Office of Inspector General ("OIG").

- The OIG determined that SOC would have terminated Nifong's employment regardless of (i) Nifong's communications to his supervisor about McKaughn's Shift Leader assignment, and (ii) Nifong's report to the State Department about inaccurate billing relating to McKaughn.

## II.

The summary judgment standard is uncontroversial. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). No triable issue exists if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation marks omitted). Once the movant meets its burden, the opposing party, to defeat the motion, must set forth specific facts showing a genuine issue for trial. *Covenant Media of S.C., LLC v. City of N. Charleston*, 493 F.3d 421, 436 (4th Cir. 2007). On a summary judgment motion, "the facts, with reasonable inferences drawn," are viewed "in the light most favorable" to the non-moving party. *Lettieri v. Equant Inc.*, 478 F.3d 640, 642 (4th Cir. 2007). Of course, only "disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Here, because there is no direct evidence of retaliatory intent, the familiar *McDonnell Douglas*[9] burden-shifting framework applies to the summary judgment motion. Although the Fourth Circuit has not directly held that the *McDonnell Douglas* framework operates in FCA retaliation cases, the Fourth Circuit has concluded that the *McDonnell Douglas* framework does apply in similar contexts, namely, retaliation claims under Title VII. *See Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015). Moreover, other circuits have routinely applied the

---

[9] *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

*McDonnell Douglas* framework to FCA retaliation claims.[10] And not surprisingly, district courts

in this circuit have consistently followed this result.[11] This is a sensible approach because, as the

First Circuit aptly put it, "[t]he *McDonnell Douglas* approach fits comfortably" with the elements

---

[10] *See, e.g., Harrington v. Aggregate Indus. Ne. Region, Inc.*, 668 F.3d 25, 31 (1st Cir. 2012) ("We hold … that the FCA's anti-retaliation provision is amendable to the use of the *McDonnell Douglas* framework."); *Liburd v. Bronx Lebanon Hosp. Ctr.*, 372 F. App'x 137, 139 (2d Cir. 2010) (affirming grant of summary judgment on FCA retaliation claim where "defendants proffered a legitimate, non-retaliatory reason for [plaintiff]'s termination and [plaintiff] failed to raise a genuine issue of material fact as to whether that reason was a pretext for retaliation"); *Diaz v. Kaplan Higher Educ., L.L.C.*, 820 F.3d 172, 175 n.3 (5th Cir. 2016) ("We … apply the *McDonnell Douglas* framework to the False Claims Act's anti-retaliation provision."); *Miller v. Abbott Labs.*, 648 F. App'x 555, 559 (6th Cir. 2016) ("In the absence of direct evidence of retaliatory motive, as here, '[t]he familiar *McDonnell–Douglas* burden-shifting framework applies to [FCA] retaliation claims.'" (quoting *Scott v. Metro. Health Corp.*, 234 F. App'x 241, 346 (6th Cir. 2007)); *United States ex rel. Schweizer v. Oce N.V.*, 677 F.3d 1228, 1240-41 (D.C. Cir. 2012) ("The First Circuit recently held that the *McDonnell Douglas* framework applies to [FCA] retaliation claims. We agree[.]" (citing *Harrington*, 668 F.3d at 30-31)); *see also Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 186 (3d Cir. 2001) (holding that, after a plaintiff establishes a prima facie case of FCA retaliation, "the burden shifts to the employer to prove the employee would have been terminated even if he had not engaged in the protect conduct"); *Townsend v. Bayer Corp.*, 774 F.3d 446, 457 (8th Cir. 2014) ("When an employee presents evidence showing an employer's stated reason for taking an adverse action against him is pretextual, such evidence also serves to prove retaliation.").

[11] *See, e.g., United States ex rel. Cody v. Mantech Int'l Corp.*, --- F. Supp. 3d ---, 2016 WL 4940332, at *8 n.15 (E.D. Va. Sept. 14, 2016) ("[A] retaliation claim under … the FCA is subject to the *McDonnell Douglas* burden-shifting analysis[.]"); *Huang v. Univ. of Va.*, 896 F. Supp. 2d 524, 554 (W.D. Va. 2012) (denying summary judgment where "reasonable jurors could conclude that Defendants' stated rationales for their decision … were merely a pretext for otherwise retaliatory action"); *Glynn v. Impact Sci. & Tech. Inc.*, 807 F. Supp. 2d 391, 416 (D. Md. 2001) (granting defendant summary judgment on FCA retaliation claim where defendant "easily demonstrate[d] that it had a legitimate, non-pretextual reason for terminating [plaintiff]"), *aff'd sub nom. Glynn v. EDO Corp.*, 710 F.3d 209 (4th Cir. 2013); *Scates v. Shenandoah Mem'l Hosp.*, No. 5:15-cv-00032, 2016 WL 6270798, at *6 n.8 (W.D. Va. Oct. 26, 2016) ("This court uses the *McDonnell Douglas* framework because it is widely endorsed by other circuits, and because [it] fits comfortably with the test that courts generally apply to retaliation claims under section 3730(h)(1)." (citations and quotation marks omitted)); *Wilson v. Raytheon Technical Servs. Co.*, No. 1:12-cv-1437, 2014 WL 12520031, at *4 & n.9 (E.D. Va. Aug 14, 2014) (applying the *McDonnell Douglas* framework to an FCA retaliation claim); *Dillon v. SAIC, Inc.*, No. 1-12-cv-390, 2013 WL 324062, at *9 (E.D. Va. Jan. 28, 2013) (same).

of an FCA retaliation claim. *Harrington v. Aggregate Indus. Ne. Region, Inc.*, 668 F.3d 25, 31 (1st Cir. 2012).[12]

Thus, to prevail on his FCA retaliation claim, Nifong must first show a prima facie case comprising three elements: "(1) [Nifong] engaged in protected activity, (2) the employer knew about the activity, and (3) the employer took adverse action against him as a result." *Smith v. Clark/Smoot/Russell*, 796 F.3d 424, 433 (4th Cir. 2015). Once a plaintiff shows a prima facie case, the burden of production shifts to the defendant to produce evidence of a legitimate, non-retaliatory reason for the adverse action. *See McDonnell Douglas*, 411 U.S. at 802. The burden then shifts back to the plaintiff to demonstrate that the defendant's stated reason is a pretext for retaliation. *See id.*

For the following reasons, the motion summary judgment motion must be granted and the FCA retaliation claim dismissed.

## III.

The undisputed factual record discloses that SOC is entitled to summary judgment because (i) Nifong cannot show a genuine dispute of fact demonstrating a prima facie case of

---

[12] Assuming, *arguendo*, that legislative history is an appropriate guide to the interpretative effort, the Senate Report for the False Claims Amendments Act of 1986 bolsters the conclusion reached here. Indeed, the Senate Report states that

> the whistleblower must show the employer had knowledge the employee engaged in 'protected activity' and [that] the retaliation was motivated, at least in part, by the employee's engaging in protected activity. Once these elements have been satisfied, *the burden of proof shifts* to the employer to prove affirmatively that the same decision would have been made even if the employee had not engaged in protected activity.

S. Rep. No. 99–345 at 35 (emphasis added), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5300. *But see Conroy v. Aniskoff*, 507 U.S. 511, 519 (1993) (Scalia, J., concurring) ("The greatest defect of legislative history is its illegitimacy. We are governed by laws, not by the intentions of legislators."); *see also id.* (noting that legislative history is "the equivalent of entering a crowded cocktail party and looking over the heads of the guests for one's friends").

retaliation, (ii) SOC has met its burden to produce evidence of a legitimate, non-retaliatory justification for discharging plaintiff, and (iii) the undisputed factual record discloses that the stated reason is not pretextual.

## A.

SOC has shown through undisputed record evidence that Nifong cannot establish a prima facie case of retaliation. To begin with, the undisputed factual record shows that Nifong did not engage in protected activity. The FCA anti-retaliation provision, in its current form, covers two types of protected activities: (i) activities taken "in furtherance of an action" under the FCA, and (ii) "other efforts to stop [one] or more" FCA violations. 31 U.S.C. § 3730(h)(1). Whether Nifong engaged in the first type of protected activity—activities "in furtherance" of an FCA action—is evaluated under the objective, "distinct possibility" standard. *See Mann v. Heckler & Koch Defense, Inc.*, 630 F.3d 338, 344 (4th Cir. 2010). Under the "distinct possibility" standard, protected activity occurs if the "employee's opposition to fraud takes place in a context where … the conduct reasonably could lead to a viable FCA action, or when … litigation is a reasonable possibility" from the employee's perspective at the time of his conduct. *Id.* (quotation marks omitted).

By contrast, the standard governing the second kind of protected activity—"efforts to stop [one] or more" FCA violations—is more expansive, but less settled. *See Smith*, 796 F.3d at 434 (noting that the second category "plainly encompasses more than just activities undertaken in furtherance of a False Claims Act lawsuit"). Recently, the Fourth Circuit, in *Carlson v. DynCorp International LLC*, assumed without deciding that this second category protects an employee's activities "motivated by an *objectively reasonable belief* that the employee's employer is violating, or soon will violate, the FCA." 657 F. App'x 168, 172 (4th Cir. 2016)

14

(emphasis added). In this respect, the Fourth Circuit assumed that a plaintiff need only show that he "believed [defendant] was violating the FCA, that his belief was reasonable, that he took action based on that belief, and that his actions were designed to 'stop [one] or more violations of' the FCA." *Id.* (quoting § 3730(h)(1)). Because the Fourth Circuit in *Carlson* explicitly applied the "reasonable belief" standard just months ago, it is appropriate to do so here.

Of course, under both standards of protected activity, the employee's conduct must relate to stopping real or suspected fraud. Indeed, "'without fraud, there can be no FCA action' or violation." *Carlson*, 657 F. App'x at 174 (quoting *Mann,* 630 F.3d at 345-46).[13] This is so because the FCA prohibits "any person" from "knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment" to the federal government, 31 U.S.C. § 3729(a)(1)(A), and from "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to a false or fraudulent claim," *id.* § 3729(a)(1)(B). And as the Fourth Circuit in *Carlson* observed, "it is axiomatic that fraud involves '[a] knowing misrepresentation or knowing concealment of a material fact made to induce another to act <u>to his or her detriment</u>.'" 657 F. App'x at 174 (quoting *Fraud*, Black's Law Dictionary (10th ed. 2014)). In this vein, mere "expressions of concern that do not raise the reasonable prospect of false or fraudulent claims under the FCA ... do not constitute 'protected activity.'" *United States ex rel. Cody v. Mantech Int'l Corp.*, --- F. Supp. 3d ---, 2016 WL 4940332 (E.D. Va. Sept. 14, 2016) (citing *Zahodnick v. Int'l Bus. Mach. Corp.,* 135 F.3d 911, 914 (4th Cir. 1997)).

---

[13] *See also Glynn v. EDO Corp.*, 710 F.3d 209, 214 (4th Cir. 2013) ("The employee's investigation must concern false or fraudulent claims or it is not protected activity under the FCA." (quotation marks omitted)); *United States ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.*, 612 F.3d 724, 735 (4th Cir. 2010) ("A protected activity need not indicate that an actual FCA suit was being contemplated, but it must evince some attempt to expose possible fraud.").

Here, Nifong asserts two protected actions: his June 2013 communications regarding McKaughn's brief promotion to Shift Leader, and Nifong's July 2013 communications with the State Department on the same topic. Neither of these putative "protected activities" passes muster.

First, the undisputed factual record discloses that Nifong's June 30, 2013 communications with his supervisor, McKittrick, and with a peer co-worker, Rollins, did not constitute protected activity under the FCA. These communications were not "in furtherance of" an FCA action because Nifong's activity did not occur "in a context where ... [Nifong's] conduct reasonably could lead to a viable FCA action, or when ... litigation is a reasonable possibility." *Mann*, 630 F.3d at 344 (quotation marks omitted). Quite the opposite: Nifong knew when he sent his June 30 notification that SOC had not yet billed the government for McKaughn's services as a Shift Leader. Thus, no FCA violation had occurred yet. Nor was there a reasonable possibility of litigation or a viable FCA action, as Nifong was merely reporting potential overcharging. That falls well short of activity "in furtherance of" an FCA action. Indeed, as the Fourth Circuit in *Zahodnick* put it, "Simply reporting [a] concern of a mischarging to the government to his supervisor does not suffice to establish that [plaintiff] was acting 'in furtherance of' a [False Claims Act] action." *See Zahodnick*, 135 F.3d at 914. Thus, where, as here, an employee never "initiated, testified for, or assisted in the filing of a [False Claims Act] action during his employment," but instead "merely informed a supervisor of [a potential overcharging] problem and sought confirmation that a correction was made," that employee has not acted "in furtherance" of an FCA action. *Id.*

Nor were Nifong's June 30, 2013 communications "efforts to stop [one] or more" FCA violations under the "reasonable belief" standard articulated by the Fourth Circuit in *Carlson*.

16

*See* 657 F. App'x at 172. Indeed, Nifong could not have reasonably believed SOC was violating, or was about to violate, the FCA—i.e., engage in fraud[14]—precisely because Nifong knew SOC had not yet billed the government, and Nifong's supervisor *commended* him for catching the potential billing overcharge and *instructed him to help correct it*. And Nifong's emphasis on Rollins's statement—that SOC should consider billing McKittrick at the higher Shift Leader rate—is of no moment, because (i) Nifong could not have been aware of that email when he first reported McKaughn's promotion, and (ii) Nifong's supervisor rejected Rollins' suggestion and endorsed Nifong's view. In fact, Nifong's undisputed actions following June 30, 2013 further foreclose any credible claim that he engaged in protected activity, because Nifong did not raise the issue of McKaughn's promotion with a supervisor for another five months. And although Nifong eventually contacted a coworker—Mr. Noble—to ask whether McKaughn had been billed as a Shift Leader, Noble informed Nifong that he did not know, and Nifong did nothing to pursue the matter. *See Lee v. Computer Sci. Corp.*, No. 1:14CV581, 2015 WL 778995, at *6 (E.D. Va. Feb. 24, 2015) (holding that there was no protected activity under the FCA where "[p]laintiff initially reported problems he observed ... to his supervisors, but did not pursue his allegations any further"). Thus, no reasonable jury could find that plaintiff's June 30, 2013 communications constituted protected activity.

Similarly, no reasonable juror could conclude that Nifong's July 2, 2013 email or communications with the Department of State constituted protected activity under either the "distinct possibility" or "reasonable belief" standard. To be sure, Nifong—like McKittrick—did notify someone at the State Department that McKaughn had been promoted to a Shift Leader. And Nifong claims he contacted the State Department because of SOC's "inaction" after Nifong

---

[14] *See Carlson*, 657 F. App'x at 174 ("[W]ithout fraud, there can be no FCA action or violation." (quotation marks omitted)).

17

had flagged the potential overcharging issue. *See, e.g.*, Am. Compl. ¶ 12. But, as the undisputed factual record reflects, Nifong sent his July 2, 2013 email to the State Department (i) without checking whether McKaughn had been billed at a higher rate, and (ii) after Nifong himself had been tasked with ensuring that the potential billing issue be addressed and, if necessary, rectified. Thus, there was no distinct possibility of litigation, or a reasonable belief that SOC had violated (or was about to violate) the FCA. This conclusion is confirmed by the undisputed facts that Nifong's other communications with the State Department conveyed only vague information, and that Nifong did not pursue the matter further. Given these undisputed facts, no reasonable jury could find that Nifong engaged in protected activity.

In sum, because the undisputed record evidence demonstrates that Nifong did not engaged in protected activity, SOC is entitled to summary judgment on the FCA retaliation claim.

Even assuming, *arguendo*, that Nifong's statements—in his June and July 2013 communications—constituted protected activity under § 3730(h), Nifong cannot rely on these communications to satisfy the second prong of a prima facie retaliation case, namely, the requirement that SOC's decision-makers be on notice of the alleged protected activity. *See Conrad v. CSX Transp., Inc.*, 824 F.3d 103, 108 (4th Cir. 2016) (holding under an analogous anti-retaliation statute that "[t]he 'knowledge' relevant for a retaliation claim ... must be tied to the decision-maker involved in the unfavorable personnel action"). As the undisputed factual record discloses, the SOC officers who determined whether to terminate plaintiff's employment were unaware of Nifong's communications regarding McKaughn's promotion until *after* they had decided to discharge Nifong. In fact, with respect to Nifong's statements to the State Department, Nifong specifically told the government that SOC was unaware that Nifong was

making any such report. Thus, Nifong cannot satisfy the "notice" prong of a prima facie retaliation case.

Finally, even if Nifong could establish a prima facie showing of protected activity and SOC's awareness of those actions—which he cannot—the undisputed factual record discloses that there was no causation here. Indeed, there is no actionable retaliation unless SOC took "adverse action against [plaintiff] *as a result*" of plaintiff's protected activity. 31 U.S.C. § 3730(h)(1) (emphasis added). But given this undisputed factual record, no reasonable juror could conclude that SOC subjected Nifong to an adverse action "as a result" of his alleged protected activity.

The FCA, by its terms, defines an adverse action as "discharg[ing], demot[ing], suspend[ing], threaten[ing], harass[ing], or in any other manner discriminat[ing] ... in the terms and conditions of employment[.]" 31 U.S.C. § 3730(h)(1). Similarly, the Fourth Circuit recently observed in the FCA context that an employer takes an "adverse action opening it up to retaliation liability if it does something that well might have dissuaded a reasonable worker from making or supporting a charge of [an FCA violation]." *Smith*, 796 F.3d at 434 (quotation marks omitted).

Here, Nifong has alleged five "adverse actions": (i) the September 25, 2013 notice of Nifong's notice and leave schedule; (ii) the September 29, 2013 phone call with Bancroft McKittrick; (iii) the October 8, 2013 remark by Kismet Rollins; (iv) the October 10, 2013 written warning that McKittrick issued Nifong, and (v) the December 23, 2013 notice of termination. Only one—the notice of termination—qualifies as a candidate for an adverse action.

The first alleged adverse action—a September 25, 2013 notice informing Nifong that, beginning October 29, 2013, Nifong would be placed on leave for 70 days—is not actionable

under the FCA. This is so because the undisputed factual record shows (i) that Nifong was not guaranteed in his contract any particular leave schedule, (ii) that at least two other employees in Nifong's same position as DPMO were given similar schedules, and (iii) that shortly after Nifong received his September 25 notice, SOC offered to revise Nifong's schedule so that he would return to Iraq after approximately 35 days' leave, as Nifong originally desired.[15] SOC's actions here—complying with the plain terms of Nifong's contract, treating him similarly to similarly situated employees, and then offering Nifong precisely what he wanted—cannot be said to "dissuade[] a reasonable worker" from supporting an FCA claim or taking efforts to stop an FCA violation. *See Smith*, 796 F.3d at 434.

The second, third, or fourth alleged adverse actions—McKittrick's September 29, 2013 oral statements, Rollins's October 8, 2013 criticisms, and McKittrick's October 10, 2013 written warning—fare no better. In essence, Nifong claims that he suffered adverse actions because his supervisor and co-worker expressed dissatisfaction with Nifong's work performance or warned Nifong about his unprofessional conduct. But a mere reprimand from a supervisor is not an adverse action by itself. *See Adams v. Anne Arundel Cty. Pub. Sch.*, 789 F.3d 422, 429 (4th Cir. 2015) (finding no retaliation under analogous Family and Medical Leave Act where a disciplinary conference and written reprimand did not affect the plaintiff's employment position, pay, or benefits). Nor is criticism from a peer actionable, as the case law uniformly reflects; this is especially true where, as here, that criticism does not cause further consequences.[16] And, as the

---

[15] And yet, as the undisputed record reflects, Nifong told SOC that he would not redeploy to Iraq and instead was seeking other employment opportunities.

[16] *See Burlington N. & Santa Fe Ry. Co.*, 548 U.S. 53, 68 (2006) ("An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience."); *Allen v. Am.*

Fourth Circuit has observed, a worker invoking an anti-retaliation statute is not "insulated from the consequences of insubordination or poor performance." *Ziskie v. Mineta*, 547 F.3d 220, 229 (4th Cir. 2008) (granting summary judgment to defendant on Title VII retaliation claim stemming from a letter of reprimand).

Applied here, these principles show that none of McKittrick's or Rollins's statements was an adverse action under the FCA. Rather, the undisputed factual record discloses that there was no change in Nifong's employment conditions arising from these events, as none of these statements was relied upon as a basis to terminate Nifong's employment.[17] *See Hopkins v. Balt. Gas & Elec. Co.*, 77 F.3d 745, 755 (4th Cir. 1996) (holding that formal disciplinary warnings about plaintiff's "job behavior" and "work relations" did not support a Title VII retaliation claim). In fact, the undisputed record evidence discloses (i) that none of McKittrick's or Rollins's statements had a financial impact on Nifong, (ii) that these comments did not affect the terms of Nifong's employment, (iii) that before his employment ended, Nifong did not describe these statements as retaliatory in any report to the State Department, and (iv) that even after these statements were made, SOC invited Nifong to extend his deployment in Iraq and to return to Iraq after the typical 35 days' leave. Thus, these statements were not adverse actions under the FCA.

The last event on which Nifong relies—the December 23, 2013 notice of termination— arguably constitutes an adverse action.[18] Assuming without deciding that Nifong's notice of

---

*Signature, Inc.*, 272 F. App'x 507, 511 (7th Cir. 2008) (holding that criticism from peer co-workers did not constitute adverse action).

[17] As explained *infra* Part III.B, the undisputed record shows that Nifong received a notice of termination because SOC's investigators concluded that Nifong had violated company policy and ITAR by giving ammunition to U.S. and Iraqi Special Forces.

[18] Defendant argues that Nifong's December 23, 2013 termination notice could not have been an adverse action because (i) Nifong had already informed defendant that he would not return to

termination was an actionable adverse action, no reasonable juror could find that SOC discharged Nifong "as a result of" his alleged protected activities. *See* 31 U.S.C. § 3730(h)(1). Indeed, the undisputed factual record shows that SOC's termination of Nifong's employment was not "a result of" any protected activity.

The first reason Nifong cannot show causation is time: Nifong, in his opposition brief, relies exclusively on a "close temporal proximity between [plaintiff]'s protected activity and the beginning of a pattern of retaliation" to establish causation. P. Br. (Doc. 57) at 24. But his alleged protected activities occurred at the end of June 2013 and beginning of July 2013, whereas the decision to terminate his employment was made on November 15, 2013, and Nifong received his termination notice on December 23, 2013. It is axiomatic in this circuit that a gap of three months—let alone the five to six months here—between a protected activity and adverse action is too long to infer a causal nexus.[19] The conclusion reached here is further supported by the undisputed fact that, during the months between Nifong's purported protected activity and the first instance of alleged retaliation, his supervisor *supported* Nifong's effort to correct the

---

Iraq and instead was seeking other employment, and (ii) Nifong did not allege constructive discharge. These arguments need not be addressed, however, because the undisputed record discloses that Nifong's termination was not retaliatory; the record reflects no causal nexus between any alleged protected activity and Nifong's discharge.

[19] *See, e.g.*, *Perry v. Kappos*, 489 F. App'x 637, 643 (4th Cir. 2012) (holding that "a three-month lapse is too long to establish causation, without more"); *Pascaul v. Lowe's Home Ctrs., Inc.*, 193 F. App'x 229, 233 (4th Cir. 2006) ("[T]hree to four months separat[ing] the [adverse action] and the claim protected activity ... is too long to establish a causal connection by temporal proximity alone."); *Swann v. US Foods, Inc.*, No. 1:14-cv-1409, 2015 WL 3793739, at *6 (E.D. Va. June 17, 2015) ("[C]ourts have consistently held that a period of three or four months between protected activity and adverse action is insufficient to establish a causal link between the two.").

McKaughn promotion and prevent any mischarge to the government. Thus there is no basis to infer retaliatory intent based on temporal proximity alone.[20]

The second reason Nifong cannot establish the requisite causation is that the record is devoid of any facts to support a causal nexus between the putative protected activity and Nifong's termination. As stated above, the undisputed record shows that Nifong's supervisor *commended* him for addressing McKaughn's promotion and *instructed* Nifong to help correct it. That belies any claim of retaliatory intent. Nor was there any retaliation "as a result of" Nifong's clandestine communications to the State Department. In fact, it is undisputed that SOC *self-reported* to the Department of State shortly after plaintiff raised the potential billing error. Thus, it strains credulity here to believe that SOC would retaliate against Nifong for doing precisely what SOC itself did. And the undisputed evidence further discloses that SOC's employees were unaware of Nifong's communications with the State Department or McKittrick until after SOC's officers had already decided to terminate Nifong's employment. *See Conrad*, 824 F.3d at 108 (noting that the "'knowledge' relevant for a retaliation claim ... must be tied to the decision-maker involved in the unfavorable personnel action"). It is also undisputed that even after Nifong engaged in his alleged protected activity, SOC not only invited Nifong to extend his deployment in Iraq, but in August and September 2013, SOC paid Nifong a combined $18,000 in bonuses. That, too, is a far cry from retaliation. Put simply, given these undisputed facts, no reasonable juror could find that Nifong has made a prima facie showing of causation.

In opposition to this conclusion, Nifong contends that SOC could be liable under a "cat's paws" theory, namely, that McKittrick's retaliatory animus against Nifong could render SOC liable for retaliation—even if SOC's decision-makers did not themselves retaliate against

---

[20] Of course, because three months is too long to infer causation, even plaintiff's earliest alleged adverse action—the September 29, 2013 phone call with McKittrick—cannot suffice.

Nifong. *See Staub v. Proctor Hosp.*, 562 U.S. 411 (2011) (discussing the "cat's paws" theory). To succeed on a "cat's paws" theory, Nifong would have to show (i) that McKittrick was "motivated by [retaliatory] animus" and (ii) that McKittrick's actions were "a *proximate cause* of the ultimate employment action." *Id.* at 422 (second emphasis added). Nifong's argument fails, because the undisputed factual record reflects that McKittrick did not harbor retaliatory animus against Nifong, and there is no evidence that McKittrick was the proximate cause of Nifong's termination; rather, as explained below, the proximate cause of Nifong's discharge was SOC's conclusion that Nifong had violated ITAR and company policy.

In sum, the undisputed factual record reflects that Nifong cannot make a prima facie case of retaliation under § 3730(h). Accordingly, SOC is entitled to summary judgment.

## B.

Of course, the conclusion reached here—that there is no causal nexus between Nifong's alleged protected activity and his termination—is confirmed by the obvious non-retaliatory ground for SOC's decision to terminate Nifong's employment, namely, Nifong's violation of ITAR and company policy concerning firearms and ammunition.[21] Thus, even assuming, *arguendo*, that Nifong stated a prima facie case of retaliation, SOC has met its burden to produce evidence of a legitimate, non-retaliatory reason for terminating Nifong's employment. *See McDonnell Douglas*, 411 U.S. at 802. And because Nifong has not shown that SOC's stated reason is pretextual, the retaliation claim must fail. *See id.*

Indeed, SOC has produced ample record evidence of a legitimate, non-retaliatory reason for terminating Nifong's employment. To begin with, the undisputed factual record reflects that

---

[21] Nothing in this Memorandum Opinion is intended as a conclusion that Nifong indeed violated ITAR. But the summary judgment record does establish that SOC had a reasonable factual basis to believe that he did. In this regard, the State Department itself concluded that Nifong's conduct violated ITAR.

on October 12, 2013, SOC's Director of Compliance learned that Nifong had been giving ammunition to U.S. Special Forces (to give to Iraqi Special Forces) without a license. Subsequently, SOC's General Counsel called for an investigation, which investigation concluded that Nifong had repeatedly violated ITAR and SOC policies. In fact, Nifong admitted to transferring U.S.-made ammunition without the license required by ITAR or the approval required by SOC policy. Moreover, in October 2013 Nifong was specifically instructed not to transfer ammunition to Iraqis unless he complied with SOC's policy and ITAR. Despite this instruction, Nifong continued to propose that SOC's ammunition be given to U.S. Special Forces personnel to be passed on to Iraqi Special Forces personnel, causing the investigators further concern. Thereafter, on November 14, 2013, SOC's investigators reported their findings to the company's General Counsel, who then recommended to SOC's Program Manager that Nifong's employment be terminated. And on November 15, 2013, the Program Manager, Thomas Heasley, decided to discharge Nifong. Given this, SOC has met its burden to show a legitimate, non-retaliatory reason for Nifong's discharge.

Importantly, Nifong has not met his burden to put forward evidence that SOC's stated justification is pretext for retaliation. In this regard, Nifong, to show pretext and survive summary judgment, must point to admissible record evidence that SOC's stated justification is "dishonest or not the real reason for [his] termination[.]" *Laing v. Fed. Express Corp.*, 703 F.3d 713, 722 (4th Cir. 2013) (quoting *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000)). Importantly, the undisputed factual record discloses that, at the time SOC decided to terminate Nifong, none of the individuals involved in that decision was aware of Nifong's alleged protected activity. Yet, Nifong unsuccessfully attempts to establish a genuine factual dispute by arguing, in essence, (i) that Nifong's supervisor, McKittrick, condoned Nifong's bartering of

ammunition with Iraqis and spoke to one of SOC's investigators during the inquiry into Nifong's potential violations of company policy and ITAR, and (ii) that SOC's investigation was not as thorough as it should have been.

Nifong's first argument—that his supervisor condoned Nifong's conduct and spoke to investigators concerning his conduct—fails to forestall summary judgment because (i) the undisputed factual record shows that the officers who decided to discharge Nifong were unaware of his alleged protected actions,[22] (ii) the record belies any claim that McKittrick harbored retaliatory animus, (iii) there is no competent record evidence to support Nifong's claim that McKittrick condoned plaintiff's conduct, and (iv) whether McKittrick condoned plaintiff's conduct is immaterial, as the SOC investigators (and OIG) concluded that Nifong indeed violated ITAR. These undisputed facts preclude Nifong from establishing pretext.

Nifong's second argument—that SOC's investigation was not as thorough as it could have been—also misses the mark. It is blackletter law that in retaliation cases a court does not sit to evaluate the wisdom or prudence of an employment decision. *See Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 272 (4th Cir. 2005) ("We do not sit as a super-personnel department weighing the prudence of employment decisions made by the defendants." (quotation marks omitted)); *Wilson v. Raytheon Tech. Servs. Co., LLC*, No. 1:12-CV-1437, 2014 WL 12520031, at *5 (E.D. Va. Aug. 14, 2014) (holding that the Court does not evaluate "the wisdom

_____

[22] *See Conrad*, 824 F.3d at 108 ("The 'knowledge' relevant for a retaliation claim ... must be tied to the decision-maker involved in the unfavorable personnel action.").

26

or fairness" of employment decisions). More important, Nifong's argument fails to cite any facts linking the supposed flaws in SOC's investigation with Nifong's purported protected activity. Thus, Nifong fails to show that pretext.

In summary, SOC has met its burden to show a legitimate, non-retaliatory reason for discharging Nifong, whereas Nifong has failed to show that SOC's stated reason is a pretext for retaliation. Accordingly, SOC is entitled to summary judgment

### III.

Put simply, Nifong's FCA retaliation claim fails at every stage of the *McDonnell Douglas* burden-shifting framework. The undisputed factual record discloses (i) that Nifong cannot establish a prima facie case of retaliation, (ii) that SOC has articulated a legitimate, non-retaliatory ground for discharging Nifong, and (iii) that Nifong cannot show that this stated reason is pretextual. Accordingly, Nifong's FCA retaliation claim must fail, and SOC must be awarded summary judgment on this claim.

An appropriate Order will issue.

Alexandria, Virginia
February 13, 2017

T. S. Ellis, III
United States District Judge